1  DOUGLAS STENZEL - SBN 75421
   Law Office of Douglas Stenzel
2  1111 Tahquitz Canyon Way, Suite 121
   Palm Springs, California 92262
3  Telephone:  760/318-8383
   Facsimile:  760/318-8393
4
5  Attorneys for:  Plaintiff Christopher Upham

6

7

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10

11  CHRISTOPHER UPHAM,                    )   **CASE NO.**
                                          )
12                       Plaintiff,       )   **COMPLAINT FOR BREACH OF**
                                          )   **CONTRACT; BREACH OF**
13  vs.                                   )   **FIDUCIARY DUTY; CONVERSION;**
                                          )   **INTENTIONAL**
14  THE PERSONAL REPRESENTATIVE           )   **MISREPRESENTATION;**
    OF THE ESTATE OF PETER M. FOX,        )   **NEGLIGENT MISREPRESENTATION;**
15  deceased; HELENA F. FOX, and the      )   **CONCEALMENT OF MATERIAL**
    Guardian Ad Litem(s) for              )   **FACTS; CONSPIRACY TO BREACH**
16  REBECCA H. FOX and ROBERT G. FOX,     )   **FIDUCIARY DUTY; CONSPIRACY**
    Minors,                               )   **TO CONVERT; CONSPIRACY TO**
17                                        )   **DEFRAUD; ACCOUNTING;**
                         Defendants.      )   **UNJUST ENRICHMENT;**
18                                        )   **INJUNCTION; CONSTRUCTIVE**
                                          )   **TRUST; AND FRAUD AND**
19                                        )   **MISREPRESENTATION**
                                          )
20  _____  )   **JURY TRIAL DEMANDED**

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

PARTIES.................................................................................................... 4

LITIGATION HISTORY............................................................................ 4

JURISDICTION AND VENUE.................................................................. 5

FACTUAL ALLEGATIONS...................................................................... 6

GENERAL ALLEGATIONS..................................................................... 12

FIRST CAUSE OF ACTION:

     Breach of Contract (Against The Decedent)................................... 23

SECOND CAUSE OF ACTION:

     Breach of Fiduciary Duty (Against The Decedent)........................ 24

THIRD CAUSE OF ACTION:

     Conversion (Against All Defendants)............................................. 25

FOURTH CAUSE OF ACTION:

     Intentional Misrepresentation (Against The Decedent)................... 25

FIFTH CAUSE OF ACTION:

     Negligent Misrepresentation (Against The Decedent)..................... 27

SIXTH CAUSE OF ACTION:

     Concealment of Material Facts (Against The Decedent)................. 29

SEVENTH CAUSE OF ACTION:

     Conspiracy to Breach Fiduciary Duties (Against All Defendants)........................ 30

EIGHTH CAUSE OF ACTION:

     Conspiracy to Convert (Against All Defendants)............................ 31

NINTH CAUSE OF ACTION:

     Conspiracy to Defraud (Against All Defendants)............................ 32

TENTH CAUSE OF ACTION:

     Accounting (Against All Defendants).............................................. 33

*(continued on next page)*

**COMPLAINT FOR BREACH OF CONTRACT, et seq.**

## **TABLE OF CONTENTS (continued)**

ELEVENTH CAUSE OF ACTION:

    Unjust Enrichment (Against All Defendants)................................................... 33

TWELFTH CAUSE OF ACTION:

    Injunction (Against All Defendants)........................................................... 33

THIRTEENTH CAUSE OF ACTION:

    Constructive Trust (Against All Defendants)................................................. 34

FOURTEENTH CAUSE OF ACTION:

    Fraud and Misrepresentation (Against Helena F. Fox)...................................... 34

PRAYER FOR RELIEF........................................................................... 35

    FIRST AND FIFTH CAUSES OF ACTION.................................................. 35

    SECOND, FOURTH, SIXTH, SEVENTH, EIGHTH AND

        NINTH CAUSE OF ACTION........................................................... 35

    THIRD CAUSE OF ACTION.................................................................. 35

    TENTH CAUSE OF ACTION.................................................................. 35

    ELEVENTH CAUSE OF ACTION............................................................ 35

    TWELFTH CAUSE OF ACTION............................................................. 36

    THIRTEENTH CAUSE OF ACTION........................................................ 36

    FOURTEENTH CAUSE OF ACTION....................................................... 36

    ALL CAUSES OF ACTION.................................................................. 36

JURY DEMAND................................................................................. 36

**PARTIES**

1.    Plaintiff Christopher Upham is a citizen and resident of the State of California and resides within the jurisdiction of the Federal District Court for the Northern District of California.

2.    Defendant Helena F. Fox is a citizen and resident of the State of South Carolina.

3.    Defendant Rebecca H. Fox is a minor and is a citizen and resident of the State of South Carolina.

4.    Defendant Robert G. Fox is a minor and is a citizen and resident of the State of South Carolina.

5.    Upon information and belief, the personal representative of the Estate of Peter M. Fox, deceased, to be appointed will be a citizen and resident of the State of South Carolina.

6.    Upon information and belief, the guardian ad litem(s) for Rebecca H. Fox and Robert G. Fox, minors, will be citizen(s) and resident(s) of the State of South Carolina.

7.    Peter M. Fox, deceased, died on December 25, 2001, a resident and citizen of the State of South Carolina (hereafter referred to as "the decedent").

**LITIGATION HISTORY**

8.    On September February 25, 1999, Upham filed a civil complaint against the decedent and others in the Superior Court for the State of California, for the County of Sonoma. The complaint alleged breach of contract; breach of fiduciary duty; conversion; intentional misrepresentation; negligent misrepresentation; concealment of material facts; conspiracy to breach fiduciary duty; conspiracy to convert; conspiracy to defraud; accounting; and unjust enrichment.

9.    The complaint referred to above bore the case number: SCV 221109. The decedent moved the Sonoma County Superior Court for an order to stay the proceedings. On November 6, 2000, the court ordered a stay of proceedings pursuant to the provisions of California *Code of Civil Procedure §418.10(a)(2)*, whereby the court retained jurisdiction of the litigation if Costa Rica proved to be an unsuitable forum, if decedent was not subject to the

jurisdiction of the Costa Rican courts **or if some other material fact compels such action.** (Emphasis added.)

10.     Plaintiff Upham thereafter filed litigation against decedent in the Third Civil Court of Major Claims of the First Civil Circuit of San Jose; case number 96-000122-182 CI-4. The litigation resulted in favor of plaintiff Upham in the Lower Court Decision No. 30-04. Decedent appealed the decision of the lower court and in May 2005, the Tribunal Segundo Civil (Second.Civil Court) in Case No. 96-000122-182-CI reversed in part the lower court decision, however, did not resolve all of the issues and allegations in Case No. SCV 221109, venued in the Sonoma County Superior Court.

11.     On May 22, 2007, the legal representatives of decedent filed a Motion to Dismiss Case No. SCV 221109 on the grounds that Peter M. Fox died on December 25, 2001; plaintiff never filed a motion pursuant to California *Code of Civil Procedure §377.41*; plaintiff failed to file a creditor's claim against the estate of decedent Fox; and the Estate of Fox was closed on November 4, 2003. The court denied the Motion to Dismiss the action.

12.     On September 10, 2007, plaintiff Upham filed a Motion to Lift the Stay of Proceedings in Case No. SCV 221109. The court (different judge) denied plaintiff Upham's motion and entered an Order to Show Cause Why The Case Should Not Be Dismissed.

13.     Due to the conflicting rulings made by different judges of the Sonoma County Superior Court, plaintiff Upham filed on February 19, 2008, a Request for Dismissal Without Prejudice of Case No. SCV 221109. The case was dismissed without prejudice as requested by plaintiff Upham.

14.     Plaintiff Upham now brings this action against The Personal Representative of the Estate of Peter M. Fox, deceased, Helena F. Fox, and the Guardian Ad Litem(s) for Rebecca H. Fox and Robert G. Fox, Minors, based upon the allegations stated herein.

## JURISDICTION AND VENUE

15.     This action is subject to the Constitution of the United States, Article III, Section 2.

**COMPLAINT FOR BREACH OF CONTRACT, et seq.**

16.    This court has independent original jurisdiction pursuant to *28 U.S.C. §1332* because this action is between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

17.    Venue is proper in the Federal District Court for the Northern District of California because plaintiff is and has been a resident of the Northern District of California.

18.    A substantial part of the events giving rise to the claims and allegations in the complaint occurred in the Northern District of California.

## FACTUAL ALLEGATIONS

19.    In late January 2003, plaintiff Christopher Upham was informally advised through independent sources in Costa Rica that defendant Peter M. Fox was deceased, dying in December 2001.  Based on such information, plaintiff's then attorney, Lyle R. Horton sent a letter to defendant's attorney, Clayton E. Clement, Esq., on February 4, 2003.  Shortly thereafter, plaintiff's attorney received correspondence dated February 10, 2003, whereby defendant's attorney confirmed that his client, Peter M. Fox, was deceased.

20.    On February 25, 2003, plaintiff's attorney, Lyle R. Horton, sent further correspondence to defendant's attorney, Clayton E. Clement, regarding the necessity of a Death Certificate to confirm the demise of the defendant, Peter M. Fox.  Defendant's attorney, Clayton E. Clement, responded in a letter dated March 4, 2003, whereby he indicated that he did not have access to defendant's Death Certificate and that he would not be able to provide said certificate.  In his March 4, 2003 letter, Mr. Clement arrogantly expressed his opinion **that defendant's representatives and attorney had no obligation to disclose the death of Mr. Fox to this court or to anyone else**. (Emphasis added.)

21.    Plaintiff Christopher Upham was advised by his Costa Rican attorneys, Bufete, Quiros and Associates, that it was imperative that a Death Certificate be provided to protect Mr. Upham's rights in Costa Rica.  On March 4, 2003, plaintiff's attorney, Lyle R. Horton, sent a correspondence to Raphael Quiros, dated March 4, 2003, including the letters between United States counsel regarding defendant, Peter M. Fox's demise.

22.    Plaintiff requested a Death Certificate in the State of South Carolina based solely on

1  defendant, Peter M. Fox's, previous association in said state.

2       23.    On June 4, 2003, plaintiff's attorney received a telephone call from Rafael A. Quiros

3  regarding the need and legal basis for a Certified Death Certificate.

4       24.    On June 6, 2003, plaintiff's attorney received a telephone call from Angel Poston

5  representing the State of South Carolina of Vital Records. Upon information and belief she stated

6  that since Mr. Upham was not a relative, the State of South Carolina required a Subpoena to obtain

7  Mr. Fox's Death Certificate, if it existed in said State.

8       25.    On May 22, 2007, defendant filed a Motion to Dismiss for failure to file a motion

9  per California *Code of Civil Procedure §377.41*, to continue the above-referenced case against the

10  personal representative or successor-in-interest of Peter M. Fox. Defendants further based the

11  motion on plaintiff's failure to file a Creditor's Claim in the estate of defendant Peter M. Fox in a

12  South Carolina Probate Court in the State of South Carolina.

13       26.    Defendant's representative filed publication of notice on January 17, 2002.

14  Defendant's attorneys did not notify defendant's largest creditor and orchestrated a scheme and plan

15  to withhold such critical information to plaintiff, including but not limited to, defendant's death on

16  December 25, 2001, and the publication of notice in probate filed in South Carolina.

17       27.    Said withholding of critical information necessary to file a claim in South Carolina

18  and file a Motion in this case was prejudiced by the overt acts and plan to file a "quick probate" to

19  prevent plaintiff Christopher Upham from complying with South Carolina probate statutes and

20  California statutes requiring a claim to be made within a year of death.

21       28.    Defendant's attorneys and representative consciously "manipulated" both State court

22  systems and the Country of Costa Rica to prevent plaintiff from asserting his rights against the

23  representatives and heirs of Peter M. Fox, deceased. They failed to notify the South Carolina court

24  of this action and as such misrepresented the material facts to the probate court of South Carolina.

25  This was done to prevent plaintiff from obtaining knowledge of Mr. Peter M. Fox's death.

26  Additionally, they failed to notice the court and plaintiff's counsel that their client, Peter M. Fox,

27  was deceased, and only felt obligated to respond to plaintiff's attorney's request after the

28  appropriate statutes had expired.

29.    The acts of defendant's attorneys and representatives were calculated to prejudice plaintiff by withholding material and critical information to plaintiff and to the South Carolina, California and Costa Rican judicial systems.

30.    Representatives of the deceased contended that plaintiff failed to file a creditor's claim in the South Carolina Probate and such failure forever barred bringing or maintaining a suit against a deceased defendant (citing South Carolina Probate Law §62-3-801(a) and § 62-3-803). This contention is wholly **not** supported by South Carolina Probate Law.

31.    South Carolina Probate Law §62-3-804(2) provides as follows:

> "Claims against a decedent's estate may be presented as follows:
> …
>
> (2)    The claimant may commence a proceeding against the personal representative in any court where the personal representative may be subjected to jurisdiction, to obtain payment of his claim against the estate, but the commencement of the proceeding must occur within the time limited for presenting the claim, and the claimant must file a written statement of the claim as in (1) above, with the clerk of the probate court. **No presentation of claim is required in regard to matters claimed in proceedings against the decedent which were pending at the time of his death."** (Emphasis added.)

32.    Clearly, all interested parties and counsel were well aware of the pending action in the Superior Court for the County of Sonoma. No creditor's claim is required in South Carolina as to proceedings pending before a deceased dies.

33.    The decedent's personal representative, Helena F. Fox, and counsel had an absolute duty to notify plaintiff of the death of defendant Peter M. Fox. They did not. *South Carolina Rules of Civil Procedure, Rule 25.* SUBSTITUTION OF PARTIES provides as follows:

> "(a) **Death.**
> (1)  If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties. The motion for substitution may be made by any party or by the successors or representatives of the deceased party and, together with the notice of hearing shall be served on the parties as provided in Rule 5 and upon persons not parties in the manner provided by Rule 4 for the service of summons. If substitution is not made within a reasonable time, the action may be dismissed as to the deceased party. **Counsel of**

**record for such deceased party shall give notice to all other parties of the death of such party as soon as practicable after obtaining such knowledge and of the name and address of the proper parties who should be substituted.**"
(Emphasis added.)

34.     The decedent's personal representative and counsel had an absolute duty to notify plaintiff of the petition for settlement and closure of the Fox probate according to *South Carolina Probate Law § 62-3-1001(a)(4)*:

"(4) proof that a notice of right to demand hearing and copies of the account, the proposal for distribution, and the petition for settlement of the estate have been sent to all interested persons including all creditors or other claimants of whom the personal representative is aware whose claims are neither paid nor barred."

35.     The decedent's personal representative and counsel failed to give notice to plaintiff of his right to demand a hearing, failed to give plaintiff copies of the account, and failed to give plaintiff the proposal for distribution of the Fox Estate. In essence, by not complying with the South Carolina Probate Law, a fraud was perpetrated on the South Carolina Probate Court.

36.     Plaintiff is not without remedy in South Carolina. *South Carolina Probate Law §62-3-1008* provides for reopening and subsequent administration:

"If other property of the estate is discovered after an estate has been settled and the personal representative discharged **or for other good cause**, the court upon petition of any interested person

and upon notice as it directs may appoint the same or a successor personal representative to administer the subsequently opened estate. If a new appointment is made, unless the court orders otherwise, the provisions of this Code apply as appropriate; but no claim previously barred may be asserted in the subsequent administration."
(Emphasis added.)

37.     Plaintiff herein certainly has good cause to reopen the South Carolina probate.

38.     Under South Carolina Probate Law, plaintiff has rights to recover as a creditor against the South Carolina personal representative, as shown in *South Carolina Probate Law §62-3-1005*:

"Unless previously barred by adjudication and except as provided in the accounting, the rights of successors and of creditors whose claims have not otherwise been barred against the personal representative for breach of fiduciary duty are barred unless a

proceeding to assert the same is commenced within six months after the filing of the account, proposal for distribution of the estate, petition for settlement of the estate, and proof required by Section 62-3-1001. **The rights thus barred do not include rights to recover from a personal representative for fraud, misrepresentation, or inadequate disclosure related to the settlement of the decedent's estate.**"
(Emphasis added.)

39. It is clear that in this case there was not only misrepresentation and inadequate disclosure related to the settlement of the decedent's estate, but also fraud.

40. The distributees of the Fox Estate have liability for any judgment in this case. *South Carolina Probate Law §62-3-1004* provides for liability of distributes to plaintiff herein:

"After assets of an estate have been distributed and subject to § 62-3-1006, an undischarged claim not barred may be prosecuted in a proceeding against one or more distributees. No distributee shall be liable to claimants for amounts received as exempt property or for amounts in excess of the value of his distribution as of the time of distribution. As between distributees, each shall bear the cost of satisfaction of unbarred claims as if the claim had been satisfied in the course of administration. Any distributee who shall have failed to notify other distributees of the demand made upon him by the claimant was asserted against him loses his right of contribution against other distributees."

41. California *Probate Code §9103* provides that plaintiff must file a creditor's claim within four months from the date of issuance of letters. In this case, plaintiff had no knowledge of defendant's death within the four-month window period.

42. Upon information and belief, Notice to Creditors was published in The Beaufort Gazette on January 17, 2002, January 24, 2002, and January 31, 2002.

43. There was a total lack of compliance with California *Probate Code §9050*, which states as follows:

"(a) Subject to Section 9054, the personal representative shall give notice of administration of the estate to the known or reasonably ascertainable creditors of the decedent. The notice shall be given as provided in Section 1215. For the purpose of this subdivision, a personal representative has knowledge of a creditor of the decedent if the personal representative is aware that the creditor has demanded payment from the decedent or the estate.
**(b) The giving of notice under this chapter is in addition to the publication of the notice under Section 8120.**" (Emp. add.)

44. The decedent's estate, through his personal representative, should not be allowed

1    to profit from the failure to give actual notice of death to plaintiff. California has a long history

2    of applying the doctrine of equitable estoppel in situations such as those presented by the facts of

3    this case. In 1998, the California Court of Appeal decided the case of <u>Battuello v. Battuello</u> 64

4    Cal.App.4[th] 842, 75 Cal.Rptr.2[nd] 548. The court gives an extensive analysis of the applicability

5    of equitable estoppel in <u>Battuello</u>:

6    "While section 366.2 clearly states that the one-year statute of
     limitations set forth therein may not be 'tolled' or 'extended,' it
7    says nothing about equitable estoppel. **(3)** The doctrines are
     distinct. As one court noted in a similar context, 'Tolling, strictly
8    speaking, is concerned with the point at which the limitations
     period begins to run and with the circumstances in which the
9    running of the limitations period may be suspended. These are
     matters in large measure governed by the language of the statute of
10   limitations itself. . . . Equitable estoppel, however, is a different
     matter. It is not concerned with the running and suspension of the
11   limitations period, but rather comes into play only after the
     limitations period has run and addresses itself to the circumstances
12   in which a party will be estopped from asserting the statute of
     limitations as a defense to an admittedly untimely action because
13   his conduct has induced another into forbearing suit within the
     applicable limitations period. It's application is wholly
14   independent of the limitations period itself and takes its life, not
     from the language of the statute, but from the equitable principle
15   that no man will be permitted to profit from his own wrongdoing in
     a court of justice. Thus, because equitable estoppel operates
16   directly on the defendant without abrogating the running of the
     limitations period as provided by statute, it might apply no matter
17   how unequivocally the application limitations period is express.'
     *(Bomba v. W. L. Belvidere, Inc.* (7th Cir. 1978) 579 F.2d 1067,
18   1070.)"

19   (At pp 847, 848)

20       45.    The Costa Rican case of *Fox v. Upham and Upham v. Fox*, Case No.: 96-000122-

21   182CI, is still pending in Large Claim Third Civil Court of San Jose. Neither the deceased nor

22   his personal representative has fully complied with the order of The First Chamber of the

23   Supreme Court of Justice of Costa Rica to provide a forensic accounting to the court and to

24   plaintiff Upham.

25       46.    The Costa Rican courts were never notified by Fox's counsel or the personal

26   representative of his estate that Fox died on December 25, 2001. A succession proceeding

27   (probate equivalent) has been opened in Costa Rica as Case No.: 03000517-185 in the Sixth

28   Civil Court of San Jose.

47.     Plaintiff Upham has retained counsel in South Carolina to re-open the Estate of Peter M. Fox. Once the estate is re-opened and a personal representative appointed by the South Carolina Probate Court, this complaint will be amended to name the appointed representative as a proper party to this litigation.

## GENERAL ALLEGATIONS

48.     In or about May 1991, the Decedent met with Upham in Sausalito, California, and solicited Upham to invest in a real estate venture in Costa Rica. The Decedent, who was aware that Upham was interested in establishing a scuba diving operation in Costa Rica, approached Upham with the idea of investing in a corporation to purchase beach front property in Costa Rica to develop into a hotel and office complex and use as a land base for Upham's scuba diving business. The Decedent informed Upham that in order to obtain the necessary tourist license from the Costa Rica government to set up his scuba diving business, Upham would need access to a land base.

49.     The Decedent told Upham that he possessed a $600,000 option on 381 acres of land in Potrero, Guanacaste, Costa Rica. The Decedent told Upham that the land was owned by Bustos and that title to the land was "clean." The Decedent further represented to Upham that The Decedent had engaged the services of Marin and his company Marschu which had confirmed that title to the property was free of all encumbrances. The Decedent told Upham that Marin was the "only internationally licensed real estate agent and developer in Costa Rica." Marin also told Upham that he had investigated title to the property; that Bustos owned the property; that the property was free of all encumbrances; and that The Decedent possessed a valid $600,000 option on the property.

50.     The Decedent proposed that Upham invest $300,000 in three Costa Rica corporations which he would set up to acquire the property. The land would be divided into three different parcels, each of which would be acquired by a different Costa Rican corporation – Zona Uno, Zona Dos, and Ventana al Mar (collectively the "VAMSA Corporations") - - which The Decedent told Upham he was going to form for the purpose of acquiring and developing the property. Upham's $300,000 would be used as a down payment for the purchase of the property

**COMPLAINT FOR BREACH OF CONTRACT, et seq.**

and in return Upham would receive fifty percent of the stock of the corporations. In return for his investment, The Decedent assured Upham that he would have the land base necessary for his scuba diving business. The Decedent told Upham that title to a portion of the Zona Uno property would be transferred to Upham.

51.    In return for contributing his option on the land to the VAMSA Corporations and providing his expertise as an architect and developer who had extensive knowledge of Costa Rica, The Decedent would get the remaining fifty percent of the stock of the corporations. The Decedent told Upham that The Decedent would manage all aspects of the affairs of the corporations and would arrange for the development and sale of the property. The Decedent was to arrange for the sale of the middle section of the property (which was to be initially acquired and held by Ventana al Mar) to a developer for no less than $500,000. Three hundred thousand dollars ($300,000) of the proceeds of the sale would be used to pay off the remaining mortgage due Bustos for the property and the remainder of the funds was to be deposited in the accounts of Zona Uno and Zona Dos.

52.    The Decedent repeatedly told Upham that based on his expertise and experience with developing property in Costa Rica, he was certain that Ventana al Mar could be sold to a developer for more than $500,000 and that the Zona Uno and Zona Dos properties would more than double in value after the sale of Ventana al Mar; and Upham's investment would yield a return of between $600,000 to $1,500,000.

53.    The Decedent also assured Upham that he would not be required to take an active role in the development or sale of the property. The Decedent was aware that Upham did not have the time or expertise necessary to actively market or develop the property as Upham intended to purchase and refurbish a commercial boat for his scuba diving operation as well as set up and market the dive operation, including getting the necessary licenses from the Costa Rican government. The Decedent represented to Upham that in consideration for his fifty percent of the shares of the VAMSA Corporations, The Decedent would handle all details relating to the development and sale of the property including locating potential developers and buyers, preparing marketing materials, administering, overseeing, and managing the property.

COMPLAINT FOR BREACH OF CONTRACT, et seq.

1   Additionally, The Decedent told Upham that he would provide Upham with accurate monthly

2   accounting for the VAMSA Corporations.

3       54.    From approximately May 1991 to December 1991, The Decedent repeatedly

4   called and sent correspondence to Upham in Santa Rosa, California, to solicit Upham's

5   investment in the VAMSA Corporations.  The Decedent repeated the statements made during his

6   initial meeting with Upham including, but not limited to, his representations that The Decedent

7   had a $600,000 option on the property; the property was owned by Bustos; title to the property

8   was "clean;" Marin had confirmed that title to the property was unencumbered; Upham's

9   investment would ensure him of a land base for his scuba diving business; Upham would be

10  given title to a portion of the Zona Uno property to set up his scuba diving business; Upham

11  would not be required to take an active role in the development, marketing and sale of the

12  property; The Decedent would provide Upham with accurate monthly accountings, the

13  development and sale of the Ventana al Mar property would more than double the value of the

14  Zona Uno and Zona Dos parcels; and that based on The Decedent's expertise in Costa Rican real

15  estate development, Upham's investment in the VAMSA Corporations would result in a

16  minimum profit to Upham of $600,000 to $1,500,000.

17      55.    In or about December 1991, Upham wired $300,000 to Ventana al Mar's bank

18  account in Miami, Florida.  In consideration for his investment, Upham received fifty percent of

19  the shares of the VAMSA Corporations.

20      56.    Upham is informed and believes, and on that basis alleges, that Upham's funds

21  were used by The Decedent, who is an officer of the VAMSA Corporations, as a down payment

22  to purchase the property from Bustos on behalf of the VAMSA Corporations.  Title to the

23  property was divided between the VAMSA Corporations.  Zona Uno acquired title to the

24  beachfront section of the property; Ventana al Mar acquired title to the middle section of the

25  property; and Zona Dos acquired title to the inland section of the property.  The Decedent, on

26  behalf of the VAMSA Corporations, entered into an agreement to pay Bustos the $300,000

27  balance of the purchase price by April 15, 1992.

28

**COMPLAINT FOR BREACH OF CONTRACT, et seq.**

57.     Upham is informed and believes, and on that basis alleges, that Upham's funds were used by The Decedent to pay $35,000 to Marin and Marschu for allegedly investigating and confirming that the property was unencumbered.

58.     On or about January 10, 1992, The Decedent and Upham entered into a written contract regarding Upham's investment in the VAMSA Corporations, a true and correct copy of which is attached hereto as Exhibit "A" and incorporated herein by this reference.  Pursuant to the contract, The Decedent agreed to arrange for the sale of Ventana al Mar to a developer as soon as possible for a price in excess of $400,000.  The Decedent also agreed that he would be responsible for providing the funds to pay off the remaining $300,000 purchase price debt.  If the stock of Ventana al Mar was sold before the date on which the purchase price debt became due, the funds of the sale would be used to retire the debt.

59.     In or about April 1992, Upham learned that title to the property was not "clean." Upham was informed that Bustos did not have clear title to the property, but rather that a Mr. Stirling had a senior interest in the property and had filed suit in Costa Rica to block the transfer of title to the VAMSA Corporations.  When Upham raised this issue with The Decedent, he was told not to worry about Stirling's claim, but that in order to protect his investment, Upham would have to pay a bribe to the Costa Rican court clerk in order to stall the prosecution of Stirling's claim.

60.     Also in or about April 1992, The Decedent informed Upham that he was having difficulty raising the additional $300,000 needed to retire the debt on the property and was not able to put together a deal for the sale of the shares of Ventana al Mar for a price in excess of $400,000, as previously agreed.

61.     In April 1992, The Decedent informed Upham that without Upham's knowledge or approval, on or about April 15, 1992, The Decedent had entered into an agreement with Grau and his company, ITL, to sell the property held by Ventana al Mar to ITL for $400,000.  The Decedent told Upham that Grau would transfer $300,000 to the VAMSA Corporation's account when title to the property had been cleared, and the remaining $100,000 at an unspecified later date.  The Decedent further informed Upham that The Decedent and Grau also agreed that The

Decedent and Upham would retain an option to resell the property in an amount in excess of $500,000 by January 1, 1993. If The Decedent or Upham arranged a deal to resell the property by January 1, 1993, then Grau would receive the first $500,000 and all remaining proceeds would be split between The Decedent, Grau and Upham.

62.     Upham refused to consent to such an arrangement as it violated both written and oral agreements between The Decedent and Upham. Moreover, when Upham insisted on seeing the written agreement between The Decedent and Grau, he discovered that The Decedent's representations were in fact false, and that The Decedent had agreed to sell Grau both the property held in Ventana al Mar and the property held by Zona Uno and Zona Dos.

63.     After Upham discovered The Decedent's attempt to sell property held by Zona Uno and Zona Dos without Upham's knowledge, The Decedent informed Upham that on or about May 12, 1992, The Decedent further agreed to pay Grau a percentage of ownership of the Zona Uno property. Any proceeds from the resale of the Ventana al Mar property by Upham or The Decedent arranged prior to January 1, 1993 in excess of $500,000 would be deposited in the account of Zona Uno.

64.     The Decedent's revised agreement with Grau again violated oral and written agreements with Upham as the sale price to Grau did not exceed $400,000 nor did Grau have the experience necessary to develop the property such that Zona Uno or Zona Dos properties would increase in value.

65.     The Decedent told Upham that if he did not consent to the agreement The Decedent had reached with Grau that Upham's investment would be jeopardized because The Decedent would be unable to raise the funds necessary to pay off the Bustos mortgage or otherwise clear title to the property. The Decedent told Upham that unless he agreed to the agreement with Grau that Bustos would foreclose on the property and Upham would lose his entire investment.

66.     Under pressure from The Decedent and in an effort to prevent the loss of his $300,000 investment, on July 19, 1992, Upham entered into a written agreement with Grau's

COMPLAINT FOR BREACH OF CONTRACT, et seq.

company, ITL, and The Decedent in Miami, Florida, a true and correct copy of which is attached hereto as Exhibit "B." Pursuant to the terms of the agreement, The Decedent and Upham agreed to sell ITL their shares in Ventana al Mar for a total price of $400,000. ITL (through Grau) agreed to pay Upham and The Decedent each $75,000 upon proof of clear title to the Ventana al Mar property. Twenty days after title had been registered in the name of ITL, ITL agreed to pay Upham an additional $60,000 and to pay The Decedent an additional $90,000. ITL agreed to pay the remaining $100,000 to The Decedent when the property was sold to a third party for a price in excess of $500,000. ITL also agreed to give Upham and The Decedent an option to resell the property to a third party for not less than $500,000 by April 1, 1993. If Upham or The Decedent arranged such a resale of the property, all funds in excess of $500,000 from the resale would be deposited in the account of Zona Uno.

67. Upham is informed and believes, and on that basis alleges, that in or about July 1992, The Decedent used VAMSA Corporation's funds to secure Stirling's title and remove his $125,000 claim. In addition, despite the fact that Bustos did not have valid title to the property, The Decedent used VAMSA Corporation funds to pay Bustos an additional $31,481.

68. Upham is informed and believes, and on that basis alleges, that despite having cleared title to the property, Grau did not complete payment on the purchase price of the shares of Ventana al Mar as required. The Decedent conspired with Grau to conceal this non-payment from Upham. On or about October 10, 1992, The Decedent informed Upham in writing that Grau had completed all payment for the sale of Ventana al Mar with the exception of $41,000 that Grau owed directly to The Decedent. The Decedent also informed Upham that all legal fees in connection with the sale of Ventana al Mar and clearing title to the property had been paid. Upham later discovered that both these representations were false. In June 1994, Upham discovered for the first time that the legal fees had not been paid, and in June 1998, The Decedent admitted in a Costa Rican deposition that in fact Grau did not pay the $300,000 for the purchase of Ventana al Mar property.

69. Upham repeatedly asked The Decedent for accurate accountings detailing the income and expenses of the VAMSA Corporations. Despite Upham's requests, The Decedent

delayed sending Upham any accountings and when he finally did send accountings to Upham, they were inaccurate, inconsistent and designed to hide from Upham the fact that The Decedent and Grau had conspired to defraud Upham of his share of the proceeds from the sale of Ventana al Mar.

70.    In or about March 1993, The Decedent again informed Upham that Grau had paid the initial $400,000 purchase price in full and that The Decedent would send Upham an accounting confirming this in two weeks.  The Decedent then asked Upham to sign over his shares of Ventana al Mar to Grau as an act of "good faith."  On or about March 23, 1993, at The Decedent's request and assurance that Grau had satisfied his obligations under the contract, Upham transferred his shares of Ventana al Mar to Grau.  Despite transferring his shares of Ventana al Mar, Upham did not receive any accountings from The Decedent until September 1993, nor did Upham receive his portion of the proceeds of the sale of Ventana al Mar.  In or about January 1995, Upham learned for the first time that The Decedent's representations were false in that Grau had not made the initial $300,000 purchase payment.  Additionally, Upham learned that the accountings sent by The Decedent to Upham were fraudulent.

71.    Upham is informed and believes, and on that basis alleges, that despite the fact that Upham has transferred his shares of Ventana al Mar to Grau, neither Grau nor ITL has ever satisfied its obligations to make the full $400,000 payment.

72.    Upham is informed and believes, and on that basis alleges, that Grau and The Decedent conspired to defraud Upham of his right share of the purchase price of Ventana al Mar and his shares of Ventana al Mar.

73.    Additionally, as early as April 1993, The Decedent attempted to coerce Upham to transfer his ten percent (10%) share of Zona Uno and Zona Dos to The Decedent.  Grau began to coerce Upham in March 1994 to also transfer the stock to The Decedent.  Both The Decedent and Grau then began to coerce Upham to accept boundary changes in the properties that would have defrauded Upham of land contained in Zona Uno, and benefited Grau.  Upham refused to bow to The Decedent and Grau's pressure.

74.    Upham is informed and believes, and on that basis alleges, that rather than devote

his time and energies to managing, developing, and marketing the VAMSA Corporation's properties, The Decedent devoted his time and energies and used the VAMSA Corporation funds to market and develop other properties held by other The Decedent controlled corporations to the detriment of the VAMSA Corporations.    Additionally, The Decedent used VAMSA Corporations' assets for the benefit of his other companies, including, but not limited to, HEI, Costa Rica Offshore, and Rancho Cartagena, without Upham's knowledge or consent.

75.    Upham is informed and believes, and on that basis alleges, that The Decedent used the funds invested by Upham in the VAMSA Corporations for his personal account without the consent or knowledge of Upham.

76.    Upham is informed and believes, and on that basis alleges, that rather than deposit whatever monies, if any, were received from Grau for the sale of Ventana al Mar into the VAMSA Corporations' accounts, The Decedent deposited such funds in his personal bank account without Upham's knowledge or consent.

77.    Upham is informed and believes, and on that basis alleges, that The Decedent engaged the service of other companies controlled by The Decedent to perform work for the VAMSA Corporations without disclosing this fact to Upham.  Moreover, The Decedent used the funds invested by Upham to pay other The Decedent controlled companies for work never performed on behalf of the VAMSA Corporations.

78.    Upham is informed and believes, and on that basis alleges, that The Decedent mismanaged the affairs of the VAMSA Corporations such that no development deal was ever possible.  Because of The Decedent's mismanagement, Ventana al Mar's corporate bank account maintained in Miami, Florida and used as a credit reference for potential developers interested in the VAMSA Corporations' properties was closed for insufficient funds.  The Decedent hid this fact from Upham such that Upham continued to use the Ventana al Mar account as a credit reference for potential developers.  As a result, no developers would seriously pursue a deal with VAMSA Corporations.

79.    Beginning in January 1992, and continuing to the date of the filing of this complaint, Upham repeatedly requested that The Decedent provide him with accurate monthly

accountings per The Decedent's previous representations. Despite Upham's numerous requests, The Decedent provided Upham with only sporadic, inaccurate, and inconsistent accountings. When The Decedent finally did send accountings to Upham, The Decedent represented that the corporations' expenses had exceeded their income and requested Upham send him additional funds to pay the corporations' expenses. In response to The Decedent's request, Upham sent The Decedent approximately an additional $7,000.

80.    Upham is informed and believes, and on that basis alleges, that from October 1991 until present, The Decedent had failed to provide current or accurate accountings despite his repeated representations that he would do so. The accountings provided by The Decedent to Upham were inaccurate, inconsistent and calculated to deceive Upham and cover up the fact that The Decedent had conspired with Bustos, Marin and Grau to defraud Upham of his investment.

81.    Despite Upham's repeated requests for documentation supporting the accountings which The Decedent sent to Upham, including receipts and cancelled checks, The Decedent has refused to send Upham such documentation.

82.    Upham also requested that Grau provide him with documentation that Grau had in fact completed payment for Ventana al Mar. Grau refused to send Upham such documentation and continues to refuse to send Upham documentation.

83.    Upham is informed and believes, and on that basis alleges, that at the time Bustos "sold" the property to the VAMSA Corporations, he owned one of the adjoining parcels of property. The Decedent was aware of this fact and failed to inform Upham of such a fact. The Decedent and Bustos conspired to keep Upham ignorant of this fact so that Upham would agree to invest in the VAMSA Corporations and not perform any additional investigations into Bustos' alleged title to the property. If Upham were aware of this fact, he would have conducted further investigation into Bustos' alleged interest in the property and would have discovered that Bustos did not have clear title to the property and would not have invested in the VAMSA Corporations.

84.    Upham is informed and believes, and on that basis alleges, that at the time Marin allegedly investigated Bustos' title to the property and confirmed that Bustos had clean title to the property, Marin also had an interest in an adjoining parcel. The Decedent was aware of this

COMPLAINT FOR BREACH OF CONTRACT, et seq.

1    fact and conspired with Marin to conceal this fact from Upham so that Upham would rely on The

2    Decedent and Marin's representations that title to the property was "clean." Had Upham been

3    aware of the fact that Marin had an interest in the adjoining property, Upham would not have

4    relied on The Decedent and Marin's representations regarding the status of the title of the

5    property and would not have invested in the VAMSA Corporations.

6        85.    Despite the fact that Upham was not supposed to have to take an active role in the

7    marketing or developing of the property, in or about 1991, Upham, at The Decedent's urging,

8    approached a group of investors based in San Francisco, California, led by Harry Roth regarding

9    a restaurant development on the Zona Uno property. Roth visited the property and expressed

10   great interest in going forward with the project and requested additional material and information

11   regarding the property. The Decedent told Upham that he would follow up with Roth and that

12   Upham did not have to pursue the matter further.

13       86.    Upham is informed and believes, and on that basis alleges, that The Decedent

14   made no effort to pursue a development deal with the Roth group. Roth called Upham numerous

15   times to inform him that he had not yet received any additional information from The Decedent.

16   Upham relayed these concerns to The Decedent, who told him that he would deal directly with

17   Roth. Eventually, Roth informed Upham that because The Decedent had still not sent Roth the

18   requested material or taken any other action to follow up on the proposed project that the Roth

19   group was no longer interested in pursuing the project.

20       87.    In or about early 1993, Upham again became concerned that The Decedent had

21   not pursued any deals to resell the Ventana al Mar property pursuant to the option contract with

22   Grau and ITL. Upham repeatedly asked The Decedent whether he was actively pursuing any

23   deals to resell the property before the option lapsed. The Decedent told Upham not to worry as

24   he was on the verge of closing a deal to sell both the Ventana al Mar property and the Zona Uno

25   and Zona Dos properties to a golf course developer. The Decedent also told Upham that Grau

26   was "on board" with the deal and was willing to extend the option period if the deal was not

27   completed by April 1, 1993.

28       88.    Concerned that the option period might lapse before The Decedent put together a

deal to sell the property and despite the fact that Upham had been assured that he would not have to take an active role in the development or sale of the property, Upham approached other development groups based in California regarding the VAMSA Corporations properties. Each development group expressed interest in the properties and requested marketing materials and additional information. Upham informed The Decedent of these potential development deals and requested that The Decedent prepare and send the requested materials. The Decedent again assured Upham that he would follow up on these prospective deals and that Upham did not have to do anything further with regard to the marketing or development of the property. Once again, The Decedent failed to send the necessary marketing materials to Upham or the potential development groups or otherwise take any action to pursue these deals. Upham repeatedly requested that The Decedent send him marketing materials so that Upham could market the property to developers in California. The Decedent continually delayed sending Upham any marketing materials until September 1993, after the option period had lapsed. Moreover, the marketing materials sent to Upham were below industry standards and could not be used to attract developers in the VAMSA Corporations' property.

89.    Upham is informed and believes, and on that basis alleges, that despite his representations to the contrary, The Decedent did little or nothing to develop or market the VAMSA Corporations' property. The Decedent did not produce timely or sufficient marketing materials and did not pursue potential development deals.

90.    Upham is informed and believes, and on that basis alleges, that The Decedent and Grau conspired to delay sending Upham marketing materials and failed to pursue development deals for the Ventana al Mar property in order to allow the option period to lapse so as to defraud Upham out of any interest in the Ventana al Mar property proceeds from its development.

91.    In reliance on The Decedent's representations that the VAMSA Corporations had clear title to the property and would provide Upham with a land base for his scuba diving business, Upham expended substantial time, energy, and money procuring a tourist license from the Costa Rican government; and purchased and refurbished a commercial boat for his scuba diving business. Also in reliance on The Decedent's representations, Upham expended

1   substantial time and money negotiating an exclusive Costa Rican dealership arrangement with

2   US Divers.

3       92.    Because of defendants' misconduct described above, Upham has been forced to

4   devote substantial time and efforts to salvage his investment in the VAMSA Corporations and

5   attempt to market and develop the property to the detriment of his scuba diving business. In

6   addition, the failure of The Decedent to transfer title of a portion of the Zona Uno property, the

7   lack of a secure land base, and the delays in developing the property have resulted in operation of

8   Upham's scuba diving business being delayed with resulting lost profits.

9       93.    Plaintiff, Christopher Upham, (hereinafter "Upham") alleges against defendants

10   The Personal Representative of the Estate of Peter M. Fox, Helena F. Fox, and the Guardian Ad

11   Litem(s) for Rebecca H. Fox and Robert G. Fox, Minors (collectively "defendants") as follows:

## FIRST CAUSE OF ACTION

### (Breach of Contract)

### (Against The Decedent)

15       94.    Upham repeats, realleges, and incorporates herein by this reference each and

16   every allegation contained in Paragraphs 1 through 93 herein, inclusive.

17       95.    Upham's agreements with The Decedent described above were contracts wherein

18   The Decedent agreed to every one of the obligations described.

19       96.    Upham has performed all on his part required for it to perform under the

20   agreements, or such performance has been waived or excused.

21       97.    The Decedent breached its obligations and continues to breach its obligations to

22   Upham by, among other ways, failing to properly manage, market or develop the VAMSA

23   Corporations' property; entering into an agreement to sell Ventana al Mar property for a price

24   which did not exceed $400,000; failing to provide Upham with timely or accurate accountings;

25   failure to contribute an option for clear title to the property to the VAMSA Corporations; failing

26   to remit Upham's portion of the proceeds of the sale of Ventana al Mar; and failing to transfer

27   title of a portion of the Zona Uno property to Upham.

28       98.    As a proximate result of The Decedent's failure to honor his agreements with

1   Upham, Upham has been damaged in the sum of at least $3,000,000, plus interest and costs.

2                                **SECOND CAUSE OF ACTION**

3                                  **(Breach of Fiduciary Duty)**

4                                  **(Against The Decedent)**

5       99.    Upham repeats, realleges, and incorporates herein by this reference each and

6   every allegation contained in Paragraphs 1 through 98 herein, inclusive.

7       100.    **The Decedent**'s relationship with Upham as described above was one of a

8   fiduciary. **The Decedent** has breached his fiduciary duty and continues to breach his fiduciary

9   duty to Upham by, among other things, misrepresenting the status of his option to purchase the

10   VAMSA Corporations' property; failing to disclose the interest of Marin and Bustos in the

11   property; failing to properly manage, market or develop the VAMSA Corporations' property;

12   failing to pursue viable development deals; attempting to change property boundaries of said

13   corporations to defraud Upham of land and benefit **The Decedent** and Grau; mismanaging the

14   VAMSA Corporations' accounts; failing to provide Upham timely or accurate accountings;

15   misleading Upham as to the VAMSA Corporations' cash flow; using the monies invested by

16   Upham for his personal account; using Upham's funds and the VAMSA Corporations' assets for

17   the benefit of **The Decedent**'s third party companies; failing to devote his time and energy to the

18   proper management of the VAMSA Corporations; using the services of other **The Decedent**

19   controlled companies without disclosing such information to Upham; reaching an agreement to

20   sell the Ventana al Mar property to the Grau operation despite Grau's lack of a proven track

21   record at developing property; allowing Grau's option to lapse without actively attempting to

22   resell the Ventana al Mar property for a price in excess of $500,000; entering into agreements

23   with Grau and ITL to the detriment of Upham and the VAMSA Corporations without Upham's

24   knowledge or consent; and conspiring with Grau, ITL, Bustos and Marin to defraud Upham out

25   of his investment in the VAMSA Corporations.

26       101.    As a proximate result of The Decedent's breach of his fiduciary duties to Upham,

27   plaintiff Upham has been damaged in the sum of at least $3,000,000, plus interest and costs.

28       102.    In addition, as a result of malicious and willful breach of fiduciary duties, Upham

**COMPLAINT FOR BREACH OF CONTRACT, et seq.**

1   is entitled to exemplary damages in an amount to set an example.

2                           **THIRD CAUSE OF ACTION**

3                                  **(Conversion)**

4                            **(Against All Defendants)**

5          103.   Upham repeats, realleges, and incorporates herein by this reference each and

6   every allegation contained in Paragraphs 1 through 102 herein, inclusive.

7          104.   Upham is informed and believes, and on that basis alleges, that The Decedent and

8   Grau have agreed to withhold Upham's share of the proceeds of the sale of Ventana al Mar.

9   Despite Upham's repeated requests, The Decedent, Grau and ITL have refused to account for or

10  remit such sum.

11         105.   As a proximate result of The Decedent, Grau and ITL's conversion of Upham's

12  funds, Upham has been damaged in the sum of at least $500,000, plus interest costs.

13         106.   In addition, as a result of malicious and willful conversion, Upham is entitled to

14  exemplary damages in an amount to set an example.

15                          **FOURTH CAUSE OF ACTION**

16                         **(Intentional Misrepresentation)**

17                            **(Against The Decedent)**

18         107.   Upham repeats, realleges, and incorporates herein by this reference each and

19  every allegation contained in Paragraphs 1 through 106 herein, inclusive.

20         108.   As set forth above, The Decedent repeatedly told Upham that: (1) he possessed an

21  option to purchase the VAMSA Corporation property from Bustos for $600,000; (2) Bustos

22  owned the property; (3) title to the property was "clean;" (4) Marin had confirmed that Bustos

23  possessed unencumbered title to the property; (5) Upham would not have to take an active role in

24  the management of the VAMSA Corporations or the marketing or developing the property; (6)

25  The Decedent would transfer title to a portion of the Zona Uno property to Upham; (7) Upham

26  would be provided with a secure land base for his scuba diving business; (8) The Decedent

27  would provide Upham with accurate, monthly accountings; (9) Upham would recoup a minimum

28  of $600,000 to $1,500,000 on his investment in the VAMSA Corporations; (10) Grau and ITL

had paid all monies required under their agreement with The Decedent and Upham; (11) all attorney's fees in connection with the Ventana al Mar sale and proper title to the property had been timely paid; (12) the accountings sent to Upham represented accurate reflections of the income and expenses of the VAMSA Corporations.

109.    Upham is informed and believes, and on that basis alleges, that the foregoing representations were in fact false when made, the true facts being that: (1) The Decedent's option to "purchase" the property from Bustos was $510,000; (2) Bustos did not own the property; (3) title to the property was not "clean" as Stirling had a superior interest in the property; (4) Marin did not properly investigate the Bustos' title to the property; (5) The Decedent lacked the skill and experience necessary to properly manage the VAMSA Corporations or market and develop the property and had no intention of doing so; (6) The Decedent never intended to transfer title of any portion of Zona Uno to Upham; (7) Upham would not be provided with a secure land base for his scuba diving business; (8) The Decedent had no intention of providing Upham with accurate, monthly accountings, but rather intended to delay sending Upham accountings and then sending him inaccurate accountings to cover up his fraudulent use of Upham's funds; (9) The Decedent would convert Upham's funds and use them for his own benefit, depriving Upham of any profit on his investment; (10) Grau and ITL have not paid the funds required under their agreement with Upham, but rather have conspired with The Decedent to defraud Upham out of his investment and shares of the VAMSA Corporations; (11) the accountings which The Decedent sent to Upham were fraudulent and calculated to cover up his conspiracy with Marin, Bustos, Grau and ITL to defraud Upham.

110.    Upham is informed and believes, and on that basis alleges, that at the time The Decedent made the foregoing representations of face he knew them to be false.

111.    Upham is informed and believes, and on that basis alleges, that The Decedent made each of the foregoing false representations with the intent to defraud Upham. Specifically, The Decedent made the foregoing false representations for the purpose of inducing Upham to rely upon them, and to induce Upham to act and refrain from acting in reliance thereon. At all times, Upham was unaware of the falsity of the foregoing representations.

**COMPLAINT FOR BREACH OF CONTRACT, et seq.**

112.    In justifiable reliance on The Decedent's misrepresentations, Upham invested more than $300,000 in the VAMSA Corporations, refrained from taking a more active role in the management of the corporations or the marketing and development of the properties; agreed to sell his shares in Ventana al Mar to Grau; refrained from sooner investigating the true facts of the status of the VAMSA Corporations and the VAMSA Corporations' property; expended approximately $880,000 to purchase and retrofit a commercial scuba diving boat with the understanding that he had a secure land base for his scuba diving operations in Costa Rica; extended time and money obtaining a Costa Rican tourist license to operate a scuba diving business; and expended time and money negotiating a franchise agreement with US Divers for an exclusive Costa Rican franchise.

113.    As a proximate result of The Decedent's misrepresentations, Upham has been damaged in the sum of at least $3,000,000 plus interest and costs.

114.    In addition, as a result of malicious and willful fraud, Upham is entitled to exemplary damages in an amount to set an example.

### FIFTH CAUSE OF ACTION

### (Negligent Misrepresentation)

### (Against The Decedent)

115.    Upham repeats, realleges, and incorporates herein by this reference each and every allegation contained in Paragraphs 1 through 114 herein, inclusive.

116.    As set forth above, The Decedent repeatedly told Upham that: (1) he possessed an option to purchase the VAMSA Corporation property from Bustos for $600,000; (2) that Bustos owned the property; (3) title to the property was "clean;" (4) Marin had confirmed that Bustos possessed unencumbered title to the property; (5) Upham would not have to take an active role in the management of the VAMSA Corporations or the marketing or development of the property, but rather that The Decedent would handle all aspects of the management of the VAMSA Corporations and the marketing or development of the property; (6) The Decedent would transfer title of a portion of the Zona Uno property to Upham; (7) Upham would be provided a secure land base for his scuba diving business; (8) The Decedent would provide Upham with accurate,

**COMPLAINT FOR BREACH OF CONTRACT, et seq.**

monthly accountings; (9) Upham would recoup a minimum of $600,000 to $1,500,000 on his investment in the VAMSA Corporations; (10) Grau and ITL had paid all monies required under their agreement with The Decedent and Upham; (11) all attorney's fees in connection with the Ventana al Mar sale and title to the property had been timely paid; (12) the accountings sent to Upham represented accurate reflections of the income and expenses of the VAMSA Corporations.

117.    Upham is informed and believes, and on that basis alleges, that the foregoing representations were in fact false when made, the true facts being that: (1) The Decedent's option to "purchase" the property from Bustos was for $510,000; (2) Bustos did not own the property; (3) title to the property was not "clean" as Stirling had a superior interest in the property; (4) Marin did not properly investigate Bustos' title to the property; (5) The Decedent lacked the skill and experience necessary to properly manage the VAMSA Corporations or market and develop the property and had no intention of doing so; (6) The Decedent never intended to transfer title of any portion of the Zona Uno property to Upham; (7) Upham would not be provided with a secure land base for his scuba diving business; (8) The Decedent had no intention of providing Upham with accurate monthly accountings, but rather intended to delay sending Upham accountings and then send him inaccurate accountings to cover up his fraudulent use of Upham's funds; (9) The Decedent would convert Upham's funds and use them for his own benefit, depriving Upham of any profit on his investment; (10) Grau and ITL have not paid the funds required under their agreement with Upham, but rather have conspired with The Decedent to defraud Upham out of his investment and shares of the VAMSA Corporations; (11) The Decedent has not paid the attorney's fees in connection with the Ventana al Mar sale; (12) the accountings which The Decedent sent to Upham were fraudulent and calculated to cover up his conspiracy with Marin, Bustos, Grau and ITL to defraud Upham.

118.    Upham is informed and believes, and on that basis alleges, that at the time The Decedent made the foregoing representations of face he had no reasonable grounds for believing them to be true.

119.    Upham is informed and believes, and on that basis alleges, that The Decedent

COMPLAINT FOR BREACH OF CONTRACT, et seq.

made each of the foregoing false representations with the intent of inducing Upham to rely upon them, and to induce Upham to act and refrain from acting in reliance thereon. At all times, Upham was unaware of the falsity of the foregoing representations.

120.    In justifiable reliance on The Decedent's misrepresentations, Upham invested more than $300,000 in the VAMSA Corporations; refrained from taking a more active role in the management of the corporations or the marketing and development of the properties; agreed to sell his shares of Ventana al Mar to Grau; refrained from sooner investigating the true facts of the status of the VAMSA Corporations and the VAMSA Corporations' properties; expended approximately $880,000 to purchase and retrofit a commercial scuba diving boat with the understanding that he had a secure land base for his scuba diving operations in Costa Rica; expended time and money obtaining a Costa Rican tourist license to operate a scuba diving business; and expended time and money negotiating a franchise agreement with US Divers for an exclusive Costa Rican franchise.

121.    As a proximate result of The Decedent's misrepresentations, Upham has been damaged in the sum of at least $3,000,000, plus interest and costs.

## SIXTH CAUSE OF ACTION

### (Concealment of Material Facts)

### (Against The Decedent)

122.    Upham repeats, realleges, and incorporates herein by this reference each and every allegation contained in Paragraphs 1 through 121 herein, inclusive.

123.    In addition to his direct misrepresentations to Upham, Upham is informed and believes, and on that basis alleges, that The Decedent concealed and continues to conceal such material facts known to him in order to induce Upham to invest in the VAMSA Corporations. Specifically, The Decedent concealed from Upham the facts that Marin and Bustos each had interests in parcels adjoining their VAMSA Corporation property.

124.    Upham is informed and believes, and on that basis alleges, that The Decedent was aware of the foregoing facts and was under a duty to disclose such facts from Upham by virtue of his fiduciary duty to Upham. The Decedent intentionally concealed such facts and continues to

COMPLAINT FOR BREACH OF CONTRACT, et seq.

1   intentionally conceal such facts from Upham to induce him to invest in the VAMSA

2   Corporations and refrain from investigating the true facts regarding Bustos' alleged title to the

3   property. At all times, Upham was unaware of the foregoing facts and would not have invested

4   in the VAMSA Corporations or refrained from investigating Bustos' alleged title to the property

5   had he known such facts.

6       125.   As a proximate result of The Decedent's concealment of material facts, Upham

7   has been damaged in the sum of at least $3,000,000, plus interest and costs.

8       126.   In addition, as a result of malicious and willful fraud, Upham is entitled to

9   exemplary damages in an amount to set an example.

10                        **SEVENTH CAUSE OF ACTION**

11                    **(Conspiracy to Breach Fiduciary Duties)**

12                         **(Against All Defendants)**

13      127.   Upham repeats, realleges, and incorporates herein by this reference each and

14  every allegation contained in Paragraphs 1 through 126 herein, inclusive.

15      128.   Upham is informed and believes, and on that basis alleges, that each defendant

16  has entered into, participated in, or knowingly acquired the benefits of a continuing unlawful and

17  fraudulent scheme, plan, and conspiracy under and pursuant to which the defendants have

18  intended to and actually did assist The Decedent in breaching his fiduciary duties to Upham.

19  Pursuant to this conspiracy, defendants have made false representations to Upham; instructed

20  each other to refuse to remit Upham's money as required; commingled Upham's money and

21  applied it for their own personal benefit and profit; directed each other to not render a proper

22  accounting; refused to prepare or deliver proper marketing materials; refused to transfer title of a

23  portion of the Zona Uno property to Upham; and attempted to coerce Upham into relinquishing

24  ten percent (10%) of the shares of Zona Uno and Zona Dos Corporations in an effort to hinder,

25  delay and defraud Upham.

26      129.   Upham is informed and believes, and on that basis alleges, that Marin and Grau,

27  as officers and directors of Marschu and ITL respectively, directly ordered, authorized and

28  participated in Marschu and ITL's tortuous conduct towards Upham.

**COMPLAINT FOR BREACH OF CONTRACT, et seq.**

1   130.   Upham is informed and believes, and on that basis alleges, that The Decedent,

2   Grau, Marin and Bustos entered into and participated in the conspiracy described above, as

3   individuals for their individual advantage.

4   131.   As a proximate result of defendants' wrongs, Upham has been damaged in the

5   sum of at least $3,000,000, plus interest and costs.

6   132.   In addition, as a result of defendants' malicious and willful actions, Upham is

7   entitled to exemplary damages in an amount to set an example.

8   **EIGHTH CAUSE OF ACTION**

9   **(Conspiracy to Convert)**

10   **(Against All Defendants)**

11   133.   Upham repeats, realleges, and incorporates herein by this reference each and

12   every allegation contained in Paragraphs 1 through 132 herein, inclusive.

13   134.   Upham is informed and believes, and on that basis alleges, that each defendant

14   has entered into, participated in, or knowingly acquired the benefits of a continuing unlawful and

15   fraudulent scheme, plan, and conspiracy under and pursuant to which the defendants have

16   intended to and actually did assist The Decedent, Grau and ITL convert Upham's monies.

17   Pursuant to this conspiracy, defendants have made false representations to Upham; concealed

18   material facts from Upham; instructed each other to refuse to remit Upham's money as required;

19   commingled Upham's money and applied it for their own personal benefit and profit; directed

20   each other to not render a proper accounting; refusing to prepare or deliver proper marketing

21   materials; refused to transfer title of a portion of the Zona Uno property to Upham; and

22   attempted to coerce Upham into relinquishing his remaining shares in the VAMSA Corporations

23   in an effort to hinder, delay and defraud Upham.

24   135.   Upham is informed and believes, and on that basis alleges, that Marin and Grau,

25   as officers or directors of Marschu and ITL respectively, directly ordered, authorized and

26   participated in Marschu and ITL's tortuous conduct towards Upham.

27   136.   Upham is informed and believes, and on that basis alleges, that The Decedent,

28   Grau, Marin and Bustos entered into and participated in the conspiracy described above, as

**COMPLAINT FOR BREACH OF CONTRACT, et seq.**

1   individuals for their individual advantage.

2       137.   As a proximate result of defendants' wrongs, Upham has been damaged in the

3   sum of at least $3,000,000, plus interest and costs.

4       138.   In addition, as a result of defendants' malicious and willful actions, Upham is

5   entitled to exemplary damages in an amount to set an example.

6                           **NINTH CAUSE OF ACTION**

7                            **(Conspiracy to Defraud)**

8                            **(Against All Defendants)**

9       139.   Upham repeats, realleges, and incorporates herein by this reference each and

10  every allegation contained in Paragraphs 1 through 138 herein, inclusive.

11      140.   Upham is informed and believes, and on that basis alleges, that each defendant

12  has entered into, participated in, or knowingly acquired the benefits of a continuing unlawful and

13  fraudulent scheme, plan, and conspiracy under and pursuant to which the defendants have

14  intended to and actually did assist The Decedent, Grau, ITL, Marin and Marschu to defraud

15  Upham.  Pursuant to this conspiracy, defendants have made false representations to Upham;

16  concealed material facts from Upham; instructed each other to refuse to remit Upham's money as

17  required; commingled Upham's money and applied it for their own personal benefit and profit;

18  directed each other to not render a proper accounting; refused to prepare or deliver proper

19  marketing materials; refused to transfer title to a portion of the Zona Uno property to Upham;

20  and attempted to coerce Upham into relinquishing his ten percent (10%) of the shares of Zona

21  Uno and Zona Dos Corporations in an effort to hinder, delay and defraud Upham.

22      141.   Upham is informed and believes, and on that basis alleges, that Marin and Grau,

23  as officer and directors of Marschu and ITL respectively, directly ordered, authorized and

24  participated in Marschu and ITL's tortuous conduct towards Upham.

25      142.   Upham is informed and believes, and on that basis alleges, that The Decedent,

26  Grau, Marin, and Bustos entered into and participated in the conspiracy described above, as

27  individuals for their individual advantage.

28      143.   As a proximate result of defendants' wrongs, Upham has been damaged in the

---

32

**COMPLAINT FOR BREACH OF CONTRACT, et seq.**

1    sum of at least $3,000,000, plus interest and costs.

2        144.    In addition, as a result of defendants' malicious and willful actions, Upham is

3    entitled to exemplary damages in an amount to set an example.

4                                **TENTH CAUSE OF ACTION**

5                                      **(Accounting)**

6                                **(Against All Defendants)**

7        145.    Upham repeats, realleges, and incorporates herein by this reference each and

8    every allegation in Paragraphs 1 through 144 herein, inclusive.

9        146.    The Decedent is required to remit an accounting, as fiduciary to Upham. Despite

10    repeated demands therefor, The Decedent has refused to remit an accurate accounting.

11        147.    Upham is entitled to an order compelling The Decedent to account for his receipt

12    of Upham's funds, the application thereof, their distribution, and other matters material to his

13    fiduciary duty.

14                            **ELEVENTH CAUSE OF ACTION**

15                                    **(Unjust Enrichment)**

16                                **(Against All Defendants)**

17        148.    Upham repeats, realleges, and incorporates herein by this reference each and

18    every allegation contained in Paragraphs 1 through 147 herein, inclusive.

19        149.    Due to the improper and unlawful conduct alleged above, defendants would be

20    unjustly enriched were they permitted to retain the funds that Upham invested, and any profits,

21    commissions, fees, and other proceeds derived therefrom.  Defendants should therefore be

22    ordered to return to Upham his total investment, plus interest and any other sums that defendants

23    have received in connection with Upham's investment.

24                                **TWELFTH CAUSE OF ACTION**

25                                      **(Injunction)**

26                                **(Against All Defendants)**

27        150.    Upham repeats, realleges, and incorporates herein by this reference each and

28    every allegation contained in Paragraphs 1 through 149 herein, inclusive.

**COMPLAINT FOR BREACH OF CONTRACT, et seq.**

151.    Due to the improper and unlawful conduct alleged above, plaintiff seeks this court to enjoin the defendants from transferring, selling or hypothecating any and all of the real property, corporate stock or any funds that Upham invested, and any profits, commissions, fees, and other proceeds derived there from.

152.    On or about March, 1996, plaintiff and the decedent entered into a stipulation agreeing that neither party be allowed to transfer, assign, convey, encumber, pledge, mortgage, create a security interest in, conceal or in any manner whatsoever dispose of the whole or any part of any shares of the corporations or any asset of the corporation without the express prior written consent of the other party. The defendants must be mandatorily enjoined from any violation of the stipulation.

### THIRTEENTH CAUSE OF ACTION

### (Constructive Trust)

### (Against All Defendants)

153.    Upham repeats, realleges, and incorporates herein by this reference each and every allegation contained in Paragraphs 1 through 152 herein, inclusive.

154.    Due to the improper and unlawful conduct alleged above, plaintiff seeks this court to impose a constructive trust as to any shares of the corporations or any asset of the corporation, any real property plaintiff invested in Costa Rica and all on all assets which were probated in South Carolina or assets that should have been probated in South Carolina and on all assets which were probated in Costa Rica or assets that should have been probated in Costa Rica.

### FOURTEENTH CAUSE OF ACTION

### (Fraud and Misrepresentation)

### (Against Helena F. Fox)

155.    Upham repeats, realleges, and incorporates herein by this reference each and every allegation contained in Paragraphs 1 through 154 herein, inclusive.

156.    Defendant, Helena F. Fox, misrepresented the condition of her husband's estate in violation of South Carolina Probate Law, including but not limited to §62-3-1005; §62-3-1008; §62-3-1001(a)(4). This defendant remains liable to plaintiff pursuant to South Carolina Probate

Law §62-3-1004.

157.    Plaintiff seeks punitive and exemplary damages against Helena F. Fox for her acts and omissions as the duly appointed personal representative of the Estate of Peter M. Fox.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, Christopher Upham, prays for judgment against defendants as follows:

## FIRST AND FIFTH CAUSES OF ACTION

1.    For damages in the amount of not less than $3,000,000 plus interest, or an amount according to proof at trial.

## SECOND, FOURTH, SIXTH, SEVENTH, EIGHTH AND NINTH CAUSES OF ACTION

2.    For damages in the amount of not less than $3,000,000 plus interest, or in an amount according to proof at trial.

3.    For punitive damages in an amount to set an example.

## THIRD CAUSE OF ACTION

4.    For damages in the amount of not less than $500,000 plus interest, or in an amount according to proof at trial.

5.    For recovery of all illegal profits made by defendants' refusal to remit Upham's funds.

6.    For punitive damages in an amount to set an example.

## TENTH CAUSE OF ACTION

7.    For an order compelling defendants to render an accounting of Upham's money entrusted to their care.

## ELEVENTH CAUSE OF ACTION

8.    That the court order defendants to return to Upham all sums invested by Upham in the VAMSA Corporations, as well as all profits, fees, commissions, and other proceeds derived therefrom.

COMPLAINT FOR BREACH OF CONTRACT, et seq.

**TWELFTH CAUSE OF ACTION**

9.    For a mandatory injunction enjoining the defendants from transferring, selling or hypothecating any and all of the real property, corporate stock or any funds that Upham invested, and any profits, commissions, fees, and other proceeds derived therefrom.

**THIRTEENTH CAUSE OF ACTION**

10.    For a constructive trust as to any shares of the corporation or any asset of the corporation, any real property plaintiff invested in Costa Rica and on all assets which were probated in South Carolina or assets that should have been probated in South Carolina and on all assets which were probated in Costa Rica or assets that should have been probated in Costa Rica.

**FOURTEENTH CAUSE OF ACTION**

11.    For damages in the amount of not-less-than $3,000,000 plus interest, or in an amount according to proof at trial.

**ALL CAUSES OF ACTION**

12.    For attorneys' fees and costs; and

13.    For such order and further relief as this court may deem just and appropriate.

**JURY DEMAND**

Plaintiff Upham hereby requests a trial by jury on all claims so triable.

Dated: *April 4, 2008*                    LAW OFFICE OF DOUGLAS STENZEL

By: _____
DOUGLAS STENZEL
Attorney for Plaintiff
CHRISTOPHER UPHAM

COMPLAINT FOR BREACH OF CONTRACT, et seq.

# EXHIBIT "A"

Agreement made on January 10, 1992 between Christopher Upham, passport of the United States of America #052357148, resident of California, U.S.A. (hereinafter "Mr. Upham") and Peter M. Fox, passport of the United States of America #033809042, resident of Alajuela, Costa Rica (hereinafter "Mr. Fox");

## Whereas

A.  Mr. Upham owns a 50% of the capital stock of each of the following Costa Rican corporations: Ventana al Mar, Sociedad Anónima (hereinafter "Ventana al Mar"); Zona Uno, Sociedad Anónima (hereinafter "Zona Uno") and Zona Dos, Sociedad Anónima (hereinafter "Zona Dos");

B.  Mr. Fox owns a 50% of the capital stock of Ventana al Mar, Zona Uno and Zona Dos;

C.  Ventana al Mar, Zona Uno and Zona Dos are all duly registered and in good standing according to Costa Rican laws;

D.  Ventana al Mar, Zona Uno and Zona Dos have recently acquired properties in Guanacaste, Costa Rica (hereinafter "the properties") and made a partial payment of US$300.000,00 (three hundred thousand dollars, currency of the United States of America), leaving a balance owed to vendor of an amount identical to the above (hereinafter "Debt"), which is due on April 15, 1992.

E.  Mr. Fox acknowledges that the funds to make the first partial payment above referred were provided by Mr. Upham;

F.  Both parties agree that it is in their interest to sell the shares of Ventana al Mar as soon as possible, for a total price that must exceed US$400.000,00 (four hundred thousand dollars);

G.  Mr. Upham wishes to assign, in case of his death, all rights and benefits derived from this agreement to his sister, Jennifer Upham.

Now, THEREFORE, for good consideration it is agreed between the parties as follows:

1.  <u>Responsibilities of the Parties</u>:

1.1  Mr. Fox must keep under his personal name the capital stock he owns in each one of the three corporations, until the debt has been paid for.

1.2  Mr. Fox will provide the funds to pay the debt.

1.3  When debt is paid for, Mr. Upham will transfer to Mr. Fox a 20% of the capital stock he now owns in Zona Uno and Zona Dos.

1.4   If the capital stock of Ventana al Mar is sold before the
date that the debt is due, both parties agree to use the
funds of the sale  to make the payment.   Aside from
making said payment, Mr. Fox will receive US$100.000,00
(one hundred thousand dollars) and the balance, if any,
will be destined to capitalize Zona Uno.

1.5   If the capital stock of Ventana al Mar is sold after the
date that the debt is due, and the debt has been at that
time paid with funds of Mr. Fox, both parties agree to
use the funds of the sale to pay US$300.000,00 (three
hundred thousand dollars) back to Mr. Fox.   Additional
funds coming from the sale will be used in the same way
as described in Clause 1.4

1.6   If Mr. Fox does not provide the funds to pay the debt,
and Mr. Upham does, Mr. Fox will inmediately transfer
to Mr. Upham a 50% of the capital stock he owns in the
three corporations.   When the capital stock of Ventana
al Mar is sold, Mr. Upham will get US$300.000,00 (three
hundred thousand dollars) plus a 75% of whatever balance
is left.   Mr. Fox will then receive a 25% of said
balance.

2.   <u>Warranties</u>:

Each of the parties hereto represents and warrants to the
other parties that it has the power to enter into this Agree
ment and perform its obligations as described herein and that
it has taken all actions necessary to execute and deliver this
Agreement, to fulfill its obligations and to consummate the
transactions contemplated by it.

3.   <u>Amendments</u>:

This Agreement may be amended only in writing signed by
authorized representatives of the parties.

IN WITNESS WHEREOF, the parties hereto have entered into this
Agreement in San José, Costa Rica, the day and year first written
above.

Christopher Upham                     Peter Fox

The signatures are authentic:



Jorge Arce Lara
Abogado
San José, Costa Rica

# EXHIBIT "B"

Agreement made on July 19, 1992, between Christopher Upham, passport of the United States of America # 052357148 (hereinafter "Mr. Upham"); Peter Marlin Fox, passport of the United States of America # 033809042 (hereinafter "Mr. Fox") and Inmobiliaria Trem, Limitada, a Chilean corporation hereby represented by Mr. Sergio Grau Torm, passport of Chile # 4773964-0 (hereinafter "Inmobiliaria Trem");

### Whereas:

A. Mr. Upham owns a 50 % of the capital stock of Ventana al Mar, S.A. and a 50 % of Zona Uno, S.A., both corporations duly organized under the laws of Costa Rica;

B. Mr. Fox owns a 50 % of the capital stock of Ventana al Mar, S.A. and a 50 % of Zona, Uno, S.A.;

C. Both Mr. Fox & Mr. Upham wish to sell to Inmobiliaria Trem their shares in Ventana al Mar, S.A., for a total price of US$400.000,00 (four hundred thousand U.S. dollars);

D. Ventana al Mar, S.A. will have clear title to a property of 243 acres in Potrero, Guanacaste, Costa Rica (Lot B of title #070243-000);

Now, therefore, for good consideration it is agreed between the parties as follows:

1. Inmobiliaria Trem will pay Mr. Upham & Mr. Fox the amount of US$150.000,00 (one hundred fifty thousand U.S. dollars) upon proof of clear title to the property owned by Ventana al Mar, S.A.

2. Twenty days after the above referred title has been registered, Inmobiliaria Trem will pay Mr. Upham the amount US$60.000,00 (sixty thousand U.S. dollars) and Mr. Fox the amount of US$90.000,00 (ninety thousand U.S. dollars).

3. When the stock of Ventana al Mar, S.A. is sold to a third party for an amount not less than US$500.000,00 (five hundred thousand U.S. dollars), Inmobiliaria Trem will pay Mr. Fox the amount of US$100.000,00 (one hundred thousand U.S. dollars).

4. Upon the receipt of the first US$150.000,00 (one hundred fifty thousand U.S. dollars), both Mr. Upham & Mr. Fox will transfer to Inmobiliaria Trem their shares in Ventana al Mar, S.A.

Page 2

5. Mr. Upham & Mr. Fox have the right to sell the property
for an amount not less than US$500.000,00 (five hundred
thousand U.S. dollars) before April 1, 1993.   If this is
completed, all the proceeds in excess of US$500.000,00
(five hundred thousand U.S. dollars) will be paid to the
accounts of Zona Uno, S.A.   If the property is not sold
before April 1, 1993, Inmobiliaria Trem will be free to
sell it to their own benefit and profit.

This agreement may be ammended only in writing signed by
authorized representatives of the parties.

In witness whereof, the parties hereto have entered into
this agreement the day and year first above written.


Christopher Upham


Peter Martin Fox


Inmobiliaria Trem, Ltda.